# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KRISTIN NORTON & ROCK WILLIAMS,
*Plaintiffs*,

v.

MATTHEW B. GALLIGAN, TOWN OF
SOUTH WINDSOR, & KEITH
YAGALOFF,
*Defendants*.

No. 3:17-cv-395 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Kristin Norton and Rock Williams (collectively "Plaintiffs") have sued Matthew B.

Galligan, the Town of South Windsor, and Keith Yagaloff (collectively "Defendants" or "the

Town") under 42 U.S.C. § 1983 for alleging violations of the Fourth Amendment of the U.S.

Constitution and Art. I, Section 7 of the Connecticut Constitution. *See* Second Am. Compl., ECF

No. 67-2 ¶¶ 21-24 (June 5, 2018).[1]

Plaintiffs have moved for summary judgment on their § 1983 claim of violation of their

Fourth Amendment rights. Mot. for Summ. J., ECF No. 106 (Mar. 7, 2019) ("Pls.' Mot. Summ.

J."); *see also* Mem. in Supp. of Summ. J., ECF No. 106-1 (Mar. 7, 2019) ("Pls.' Supp. Mem.");

Statement of Material Facts, ECF No. 106-2 (Mar. 7, 2019) ("Pls.' SMF"); and Exhibits 1-5,

ECF No. 106 3-5 (Mar. 7, 2019) ("Pls.' Supp. Ex.").

Defendants also have moved for summary judgment against Plaintiffs' Second Amended

---

[1] The Second Amended Complaint also contained a slander claim against Yagaloff. Second Am. Compl. ¶¶ 24-27.
Plaintiffs, however, decline to pursue their defamation claim against Yagaloff and concede that summary judgment
should be granted on this claim. Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 125 at 6 (June 27, 2019) ("Pls.'
Reply") ("Plaintiff [sic] do not intend to further pursue their claims of defamation against Defendant Keith Yagaloff
and therefore will not respond to the arguments raised in his Memorandum. Plaintiffs intent [sic] to withdraw the
defamation count.").

Complaint in its entirety. Mot. Summ. J., ECF No. 121 (May 24, 2019) ("Defs.' Mot. Summ. J."); *see also* Mem. in Supp. of Summ. J., ECF No. 121-1 (May 24, 2019) ("Defs.' Supp. Mem."); Statement of Material Facts, ECF No. 121-2 (May 24, 2019) ("Defs.' SMF"); Exhibits A-HH, ECF Nos. 121 3-36 (May 24, 2019).

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED**; Defendants' motion for summary judgment is **GRANTED** in part, as it relates to Mr. Yagaloff and the Town of South Windsor, but otherwise is **DENIED**. Defendants' motion for summary judgment as to the slander claim against Mr. Yagaloff is **MOOT**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

Kristen Norton owns the property at 460 Miller Road, South Windsor, Connecticut. Pls.' SMF ¶ 1, a property zoned for residential use only. Defs.' SMF ¶ 2; Aff. Of Pamela Oliva – Defs.' Supp. Ex. B, ECF No. 121-4 ¶ 7 (May 24, 2019). Since 2011, Rock Williams has lived with Ms. Norton at this address. *Id.*; Defs.' Opp'n SMF ¶ 1; Defs.' SMF ¶ 3.

Both Plaintiffs own and operate CT, Contracting Services, LLC, a company that cleans foreclosed homes, changes locks, cuts lawns in the summer, plows driveways in the winter, and makes other necessary repairs to "secure the homes for future resale." Pls. SMF ¶ 2.

From 2012 to 2017, Ms. Norton and Mr. Williams collected abandoned personal property from foreclosed homes, and sold items at flea markets, tag sales, and auctions. Defs.' SMF ¶ 6.

---

[2] Plaintiffs did not submit a Local Rule 56(a)2 Statement of Facts in opposition to Defendants' motion for summary judgment. As a result, the facts contained in Defendants' Local Rule 56(a)(1) statements are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Other facts are drawn from Pls.' SMF; Defs.' Opp'n SMF, 122-1 (May 28, 2019) ("Defs.' Opp'n SMF"); and Defs.' Local Rule 56(a)(1) Statement, ECF No. 121-2 (May 24, 2019) ("Defs.' SMF").

They claim that all of this personal property "was carefully stored outside in a segregated section of the backyard under tarps for future resale." Pls.' SMF ¶ 3. Their alleged personal property included "broken and sharp pieces of metal and wood, a rusted x-ray machine, broken household appliances and tools, various pieces of other appliances and tools, broken pieces of furniture, old car tires, pesticides, flammable oils, a dilapidated camping trailer, and miscellaneous other refuse" that occupied curbside space and space in the front, back, and side yards. Defs.' Opp'n SMF ¶ 7.

In October 2012, Pamela Oliva, the Town's Zoning Enforcement Officer, "received a complaint from a resident about debris on the plaintiffs' property at 460 Miller Road." Defs.' SMF ¶ 9. On October 24, 2012, Ms. Oliva "performed a visual inspection from the public street . . . and observed miscellaneous debris strewn across the front yard, a camping trailer parked on the front yard, several large propane tanks, and a rusted plow." *Id.*

On November 2, 2012, Ms. Oliva sent a letter to Ms. Norton, then Ms. Lanata, informing them that the debris on their property met the definition of "junkyard" under the Town of South Windsor Zoning regulations, and instructing her to remove the debris within ten days. *Id.* ¶ 11. After the notice, "debris [was still] scattered about their property." *Id.* ¶ 12.

In April 2014, Ms. Oliva again visited 460 Miller Road and observed "a large amount of debris," which met "the definition of 'blighted property' under the Town's anti-blight ordinance . . . [or] residential properties containing accumulated debris." Defs.'SMF ¶ 13.

The Town again sent Ms. Norton a letter notifying her that "460 Miller Road was blighted and that South Windsor intended to take enforcement action." Pls.' SMF ¶ 5. The letter referenced Section 4 of the Anti-Blight Ordinance, which "finds it to be a public nuisance for any person owning any premises in South Windsor to maintain such premises as blighted

property." Pls.' Ex. 1 - May 2, 2014 Letter, ECF No. 3 (Mar. 7, 2019) ("May 2014 Letter"). The

Letter notified Ms. Norton that a failure to remove accumulated debris by May 29, 2014 could

result in "enforcement action and potential daily penalties of one hundred dollars . . . . " *Id.*

Ms. Norton contacted Ms. Oliva and asked what she needed to do to comply. According

to her, Ms. Oliva responded that she "needed to put a fence around her property so that

everything stored in the backyard was hidden from view." Pls.' SMF ¶ 6. According to the

Defendants, Ms. Oliva told Ms. Norton that "she needed to remove all of the material property,

not just put it behind a fence." Defs.' Opp'n SMF ¶ 6.[3]

On September 9, 2014, Ms. Oliva had a blight lien placed on Ms. Norton's property and

notified Ms. Norton of the lien. Defs.' SMF ¶ 16.

On October 10, 2014, Ms. Oliva sent a "Cease and Desist" letter to Ms. Norton, again

notifying her that her property met the definition of "junkyard" and violated zoning regulations.

*Id.* ¶ 18. The letter required removal of debris from the property by October 24, 2014. *Id.*

In October 2014, Plaintiffs installed a stockade fence around their backyard, Pls.' SMF ¶

7, or leaned the fence against some of the debris, Defs.' Opp'n SMF ¶ 7. They "believed they

had abated the blight." Pls.' SMF ¶ 7.

Between October 2014 and March 2015, Plaintiffs "installed fence posts to secure the

fence pieces, but the fence did not reach around the entire yard, it contained gaps between the

fence pieces, and the debris was still publically [sic] visible at all times." Defs.' Opp'n SMF ¶ 7.

On November 7, 2014, Ms. Oliva had a caveat recorded in the Town's land records.

Defs.' SMF ¶ 22. A caveat "is a written notice to anyone viewing the land records that the

---

[3] Parties do not specify the exact date this conversation occurred.

plaintiffs' property is a zoning violation." *Id*. Plaintiffs received the notice on November 8, 2014. *Id.* ¶ 23.

On March 16, 2015, Ms. Oliva and Ms. Norton spoke on the telephone. Ms. Oliva recalls telling Ms. Norton that all of the debris or material on the property needed to be removed, that placing it behind a fence was insufficient. *Id.* ¶ 24. Ms. Norton does not recall that statement. *Id.* (citing Defs.' Ex. A – Norton Dep. 91:2 – 93:25 (May 24, 2019)).

Plaintiffs continued to leave bulky waste by the curb. *Id.* ¶ 26. The Town sent Plaintiffs a letter stating "that the Town's trash collector would not take such waste when it was not properly stored in waste bins." *Id.* The letter also remined Plaintiffs that any "waste generated from [their] business must be collected separately from [ ] residential waste." Defs.' Ex. S – Non-Acceptable Bulky Waste Materials, ECF No. 121-21 at 2 (May 24, 2019).

On November 13, 2015, Ms. Norton visited Ms. Oliva's office. Defs.' SMF ¶ 29. Ms. Oliva recalls informing Ms. Norton that blight and debris were visible through the gaps in the fence and, even if the debris were behind a fence, the property would still constitute a junkyard. *Id.* She also recalls telling Ms. Norton that only removal of all the material or debris would correct the cease and desist. *Id.* Ms. Norton does not recall Ms. Oliva using the word "junkyard." *Id.* ¶ 30 (citing Norton Dep. 113:7 – 115:25).

In December 2015, the Town prepared a revised anti-blight ordinance, or "Ordinance # 207," Defs.' SMF ¶ 35, and enacted it on January 19, 2016. Pls.' SMF ¶ 8. "Blighted Structure" is defined within the ordinance as "properties that fail to be maintained, properties that include improperly stored garbage, trash, and debris, properties that include attraction of illegal activity or attractive nuisance, and an existence or use that interferes with reasonable and lawful use of

other properties within the neighborhood[.]" Defs.' SMF ¶ 36 (citing to Defs.' Ex. AA –
Ordinance #207, ECF No. 121-29 at 2 (May 24, 2019) ("Ordinance #207")).

Penalties for offenses of Ordinance #207 include "a citation or summons for a violation
of this ordinance." Pls.' SMF ¶ 9; Defs.' Opp'n SMF ¶ 9. The ordinance allows for additional
enforcement means:

> [T]he Town Manager is authorized to initiate legal proceedings in
> the Superior Court for the immediate correction of the violation(s),
> collection of any penalties, and the recovery of all costs including
> costs of remedial action, court and the reasonable attorney's fees . .
> . Further, the Town Manager or Enforcement Officer are authorized
> to take such immediate action as may be provided herein.

Pls.' SMF ¶ 9; Defs.' Opp'n SMF ¶ 9. Section 10, titled "Immediate Action," provides:

> [(a)] Where the Town Manager or Enforcement Officer determine
> that there is a condition that causes an immediate danger to health,
> safety or welfare of the users, occupants or owner of property or to
> health, safety or welfare of residents of the town or that there is an
> immediate danger to other property, such officer shall cause the
> town or its agents or employees to make immediate repairs or to
> effect whatever other work may be necessary to eliminate the cause
> or causes of such danger and place a lien on the subject property for
> the cost of the repairs or other work.
>
> [(b)]Where the Town Manager or Enforcement Officer determine
> that there is a condition that causes an immediate danger to the
> health, safety or welfare of the users, occupants or owner of property
> or to health, safety or welfare of residents of the town or that there
> is an immediate danger to other property, such officer and his agents
> shall have the right to enter upon said property for the purpose of
> evaluating the extent and causes of the danger and for making
> repairs, Defs.' SMF ¶ 37 (citing Ordinance #207 at 5-6),
>
> (c) As soon as practicable, the officer entering the property for a
> purpose set forth above shall take all reasonable efforts to contact
> the owner, lessee or occupant of the subject property and give
> information concerning the need for immediate action.

Pls.' SMF ¶ 10; Defs.' Opp'n SMF ¶ 10.

From January to March 2016, debris and material were present on Plaintiffs' Property. Defs.' SMF ¶¶ 45, 47.

On April 19, 2016, Plaintiffs contend that "the backyard of 460 Miller Road was completely encircled with a stockade fence with no trespassing signs that prevented anyone from entering." Pls.' SMF ¶ 11. A segregated section of the backyard held "pallets and plastic bins containing the reclaimed personal property covered with tarps. . . ." *Id.* Defendants maintain that the fence contained gaps and "debris was publically [sic] visible at all times." Defs.' Opp'n SMF ¶ 11. "The debris was not limited to any 'segregated section.'" *Id.*

On April 19, 2016, Town Manager Matthew Galligan and William ("Billy") Mitchell, the owner and operator of Environmental Services, Inc. ("ESI") visited 460 Miller Road. Pls.' SMF ¶ 12. ESI is a "vendor approved" contractor, meaning ESI's services are retained on an as-needed basis to clean up environmental issues. Defs.' SMF ¶ 49. Ms. Oliva had previously expressed concerns about the plaintiffs' property because "they were storing debris that could break down outside in their yard" and because of the possibility of "mosquitos and insects breeding in the standing water and debris that was piled upon the property." Defs.' SMF ¶ 50. Mr. Galligan shared similar concerns. *Id.* ¶ 51.

Mr. Galligan also knew that the catch basis located on 460 Miller Road drained into Plum Gully Stream, which ultimately deposits into the Connecticut River. *Id.* ¶ 52. The Connecticut Department of Energy and Environmental Protection "required the Town to be responsible for any dangerous chemicals or other liquids that leaked into catch basins that lead to such watercourse." *Id.* Resident had complained about the Plaintiffs' storing of air conditioners and refrigerators in their backyard and had expressed concern that "Freon [ ] could leak into the soil

when the air conditioners were left outside to rust and break down." *Id.* ¶ 53. Mr. Galligan also expressed concern about the old furniture stored outside as "there could be paint thinners and shellac that could break down and get into the soil and groundwater." *Id.* ¶ 54. Mr. Mitchell stated similar concerns to Mr. Galligan on the April 19, 2016 visit. *Id.* ¶ 56.

During the visit, Mr. Galligan saw "air conditioners, [a] refrigerator, paints, debris, broken fence pipes, rusted tools, and mangled metal. . . which confirmed the immediate dangers, health hazards, and blight on the plaintiffs' property as previously reported." *Id.* ¶ 55.

Mr. Galligan and Mr. Mitchell were asked to leave by Mr. Williams, but continued to look over the stockade fence into the Plaintiffs' backyard. Pls.' SMF ¶ 12. Mr. Galligan and Mr. Mitchell eventually calmly walked away, got in their vehicle, and drove off. *Id.*¶ 13. Ms. Norton learned of the visit from Mr. Williams and a video he took. *Id.* ¶ 12.

After learning of the incident, Ms. Norton "immediately went to South Windsor Town Hall to speak to [Mr.] Galligan who responded by rudely and loudly yelling at [Ms.] Norton, causing her fear for her personal self[,]" so she left without an "explanation as to [ ] South Windsor's specific concerns or proposed actions." *Id.* ¶ 14. Defendants deny that Mr. Galligan "rudely and loudly yelled at Ms. Norton" and, conversely, state Mr. Galligan informed Ms. Norton "that items would be removed from her property." Defs. Opp'n SMF ¶ 14.

On April 20, 2016, Mr. Galligan, Mr. Mitchell, employees of ESI, and other South Windsor employees appeared at 460 Miller Road. Pls.' SMF ¶ 15. Defendants clarify that, at 7:00 A.M. on April 20, 2016, Mr. Galligan, Mr. Mitchell, several ESI employees, and two South Windsor Police Officers "arrived on the public street in front of the plaintiffs' property." Defs.' Opp'n SMF ¶ 15. Plaintiffs "were presented with no court order or search warrant." Pls.' SMF ¶ 16; Defs. Opp'n SMF ¶ 16. Plaintiffs characterize Defendants' actions as "breaking and entering

through the stockade fence[,]" Pls.' SMF ¶ 16, while Defendants state they "removed a portion of the plaintiffs' fence so that they could enter the backyard, at which point they brought two large dumpsters . . . and the ESI employees began the cleanup action by removing debris and placing it in dumpsters[,]" Defs.' Opp'n SMF ¶ 16.

Items found stored in Plaintiffs' backyard on April 20, 2016, included "an x-ray machine, propane tanks, various oils, paints, pesticides, tires, broken tools, a dryer, air conditioners, microwaves, a refrigerator, electric fans, a vacuum motor, pieces of furniture, broken household appliances, sharp pieces of wood and metal, large piles of scrap metal, and other similar items." Defs.' SMF ¶ 59. Piles of scrap metal were also in the backyard. *Id.* ¶ 60.

Plaintiffs protested and were told by the South Windsor Police Department they would be arrested if they interfered. Pls.' SMF ¶ 17. Defendants maintain Plaintiffs were not told they would be arrested. Defs.' Opp'n SMF ¶ 17.

Defendants removed approximately ten to twelve large roll dumpsters with personal property, which had been stored for future resale. Pls.' SMF ¶ 18.

After receiving a phone call from Mr. Galligan on April 20, 2016, Defs.' Opp'n SMF ¶ 19, Mr. Yagaloff appeared and entered Plaintiffs' property that same day, Pls.' SMF ¶ 19. Defendants recall that Mr. Yagaloff never entered the property and had a conversation with Ms. Norton adjacent to the property. Defs.' SMF ¶ 19. In the conversation, Mr. Yagaloff "explained the purpose of the cleanup action was to enforce the Town's zoning and blight regulations," and Ms. Norton never told him to leave the property at any time. *Id.*

Ms. Norton also recalls ESI employees taking debris to their personal vehicles, rather than the dumpster. Pls.' SMF ¶ 20. Defendants clarify that Ms. Norton testified "she observed ESI employees who were 'hired to take the debris out instead of putting it in there, into the

dumpster, they were walking with that to their vehicles.'" Defs.' Opp'n SMF ¶ 20 (quoting Norton Dep. 163:22-25).

Plaintiffs allege the clean-up, or violation of rights, lasted four days including April 19, 2016. Pls.' SMF ¶ 21. Defendants contend that the clean-up was not unlawful or a violation of rights, and that Ms. Norton testified the cleanup went on for two or three days. Defs.' Opp'n SMF ¶ 21; Norton Dep. 160:1-8.

As for the immediate danger present at 460 Miller Road, Mr. Galligan testified that there was material "that needed to be evaluated and removed. It was a garbage dump and it wasn't a controlled environment," and that other residential properties "could be affected as well by any type of leaching from that – from standing water or whatever leaks out of that area." Pls.' SMF ¶ 22 (quoting Pls.' Ex. 5 – Galligan Dep., ECF No. 3 at 28:3-15 (Mar. 7, 2019)). Mr. Galligan repeated that the immediate environmental danger allowed him to take action and did not require him to go to Superior Court first. *Id.* ¶ 23.

On September 27, 2016, the Town recorded a lien of $26,556.80 for the cleanup costs incurred between April 20 and April 22, 2016. *Id.* ¶ 25.

**B.    Procedural History[4]**

On March 7, 2019, Plaintiffs filed a motion for summary judgment. Mot. for Summ. J., ECF No. 106 (Mar. 7, 2019) ("Pls.' Mot. Summ. J."). Plaintiffs also filed a supporting memorandum, Pls.' Supp. Mem.; a statement of material facts, Pls.' SMF; and supporting exhibits, Pls.' Supp. Exs.

---

[4] The Court presumes familiarity with procedural history preceding these motions for summary judgment. The Court omits the motion for summary judgment filed by Environmental Services, Inc. and Billy Mitchell as those Defendants have been dismissed, following a stipulation of dismissal. *See* Mot. for Summ. J., ECF No. 119 (May 22, 2019); Stipulation of Dismissal, ECF No. 154 (Dec. 9, 2019).

On May 24, 2019, Defendants also moved for summary judgment. Mot. for Summ. J., ECF No. 121 (May 24, 2019). Defendants filed a supporting memorandum, Defs.' Mem., ECF No. 121-1 (May 24, 2019); a statement of material facts, Defs.' SMF; and supporting exhibits, ECF Nos. 121-3 to 121-36.

On May 28, 2019, Defendants filed an opposition memorandum to Plaintiffs' motion for summary judgment, Defs.' Opp'n Mem., ECF No. 122 (May 28, 2019); a statement of material facts in opposition, Defs,' Opp'n SMF; and accompanying exhibits, Defs. Opp'n Exs., ECF Nos. 122 3-33 (May 28, 2019).

On June 24, 2019, Plaintiffs filed a combined reply to Defendants' opposition to their motion for summary judgment and an objection to Defendants' cross-motion for summary judgment. Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 125 (June 24, 2019) ("Pls.' Reply").

On June 27, 2019, Defendants filed a response to Plaintiffs combined response/reply. Defs.' Response, ECF No. 126 (June 27, 2019) ("Defs.' Response").

On February 27, 2020, the Court held a motion hearing on the pending motions for summary judgment. Minute Entry, ECF No. 157 (Feb. 27, 2020).

## II.  STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any

other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed.

R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D.

Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light

most favorable to the non-moving party and to draw all reasonable inferences in [his] favor."

*Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013)

(citation omitted). If there is any evidence in the record from which a reasonable factual

inference could be drawn in favor of the non-moving party for the issue on which summary

judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old

Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.  DISCUSSION

### A.  The Fourth Amendment Claims[5]: The Relevant Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

A search occurs when "the person invoking [the Fourth Amendment's] protection can claim a

'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by

government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). "The [Fourth] Amendment

does not protect the merely subjective expectation of privacy, but only those 'expectation[s] that

society is prepared to recognize as 'reasonable.'" *Oliver v. United States*, 466 U.S. 170, 177

(1984) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring))).

---

[5] Plaintiffs move for summary judgment on their Fourth Amendment claim. Pls.' Supp. Mem. at 1-2. Plaintiffs
initially brought the Fourth Amendment claim with a Connecticut state law claim for violations of Art. I, Sec. 7 of
the Connecticut Constitution. Second Am. Compl., ECF No. 61-1 ¶¶ 22-24 (June 5, 2018). Plaintiffs, however, do
not mention this part of the claim in their motion for summary judgment. The Court will thus analyze their motion
only with respect to the Fourth Amendment.

"Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Massey*, 461 F.3d 177, 178 (2d Cir. 2006) (internal quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (the reasonableness inquiry balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake").

"[A]dministrative searches . . . are significant intrusions upon the interests protected by the Fourth Amendment." *Camara v. Municipal Court of City and Cty. of San Francisco*, 387 U.S. 523, 534 (1967); *see also Palmieri v. Lynch*, 392 F.3d 73, 78-79 (2d Cir. 2004) ("A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances."). When administrative searches are "authorized and conducted without a warrant procedure [they] lack the traditional safeguards which the Fourth Amendment guarantees to the individual[.]" *Id.; see also Dutkiewicz v. City of Bristol*, No. 3:11-CV-00790 (JCH), 2011 WL 3267761, at *2 (D. Conn. July 28, 2011) ("Administrative searches conducted without a warrant procedure may implicate Fourth Amendment protections, enforced against the state through the Fourteenth Amendment."). "'[R]outine inspection of the physical condition of private property' qualifies as a search, even though it may be a 'less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of a crime.'" *Cox v. Dawson*, No. 3:18-cv-578 (JBA), 2020 WL 127890, at *5 (D. Conn. Jan. 10, 2020) (quoting *Camara*, 387 U.S. at 534).

"'[P]robable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a

particular dwelling." *Camara*, 387 U.S. at 538. "In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for inspection must be weighed in terms of these reasonable goals of code enforcement." *Id.* at 535. Courts may look to administrative standards to ascertain probable cause, the standards "may be based upon the passage of time, the nature of the building (e.g., multifamily apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of a particular dwelling." *Id.* at 538.

Commercial centers have less protection than the home under the Fourth Amendment, where a "home [was] converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business," warranting a lesser protection of the Fourth Amendment. *Lewis v. United States*, 385 U.S. 206, 211 (1967); s*ee also New York v. Burger*, 482 U.S. 691, 703 (1987) ("In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officer."); c*f. Lewis*, 385 U.S. at 211 ("[T]his does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials[.]").

The decreased expectation of privacy in commercial areas depends, in part, on the type of industry a businesses is engaged in. *Burger*, 482 U.S. at 700 (expectation of privacy is "particularly attenuated in commercial property employed in 'closely regulated' industries" where there exists a long tradition of close government supervision"). Regular inspection does not completely eliminate Fourth Amendment protections, even though junkyards may be closely regulated in Connecticut, Conn. Gen. Stat. § 22a-117, *et seq.*

Warrantless searches in pervasively regulated businesses are reasonable if three criteria are met.

> First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.' . . . Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Burger*, 482 U.S. at 702 (internal citations omitted).

Other exceptions to the warrant requirement include, among others, searches undertaken because of exigent circumstances and or when the officials conducting the search act as community caretakers. "In determining whether exigent circumstances exist to justify a warrantless search, '[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer . . . to believe that there was an urgent need to render aid or take action.'" *Tiramani v. Johnson*, 307 F. Supp. 3d 31, 37-38 (D. Conn. 2018) (alteration in the original) (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)); *see also Kentucky v. King*, 563 U.S.t 452, 460 (2011) ("One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978))). Courts apply an objective test that "turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). "Any warrantless entry based on exigent circumstances, must, of course, be supported by a genuine exigency." *King*, 563 U.S. at 470 (citing *Brigham*

*City*, 547 U.S. at 406). "In determining whether there was an 'urgent need' to take action, the 'gravity of the underlying offense' is considered 'an important part of [the] constitutional analysis." *Harris v. O'Hare*, 770 F.3d 224, 235 (2d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751-52 (1984)).

Similar to the exigent circumstances exception is the community caretaking exception, which encompasses police functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). For example, "[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (internal quotation marks and alteration omitted).

**B. The Application of this Standard to the Various Fourth Amendment Claims**

Ms. Norton and Mr. Williams bring Fourth Amendment claims against three parties: Matthew Galligan, the Town Manager for South Windsor, in his individual capacity, the Town of South Windsor itself, and Keith Yagaloff, the Town of South Windsor's counsel, in his individual capacity.

Ultimately, for the reasons discussed below and having considered these claims, the Court has concluded the following.

First, there is a genuine issue of fact with respect to whether Ms. Norton and Mr. Williams's rights have been violated under the Fourth Amendment. As a result, the summary judgment motion brought by Ms. Norton and Mr. Williams must be denied.

Second, that same genuine issue of material fact requires the denial of the motions for summary judgment brought by Mr. Galligan. While Mr. Galligan alternatively argues for

dismissal of the Fourth Amendment claims against him under the qualified immunity doctrine, there are factual issues that first must be resolved before that doctrine can properly be applied to the claim against him.

Third, the summary judgment motion brought by Mr. Yagaloff must be granted. Even though there are factual issues which must be resolved on key Fourth Amendment issues, Mr. Yagaloff nevertheless is entitled to qualified immunity. There is no clearly established law that an attorney seeking to provide legal advice to his client should be subject to a Fourth Amendment claim for failing to prevent his client from violating the Fourth Amendment.

Fourth, the summary judgment motion brought by the Town of South Windsor will be granted. By not responding to this particular claim, one predicated on both Mr. Galligan's legal authority, as the Town of South Windsor's Town Manager, to hold the Town of South Windsor liable for violating the Fourth Amendment, and whether Mr. Galligan's actions actually violated the Fourth Amendment, Ms. Norton and Mr. Williams have abandoned this claim. Of course, as a practical matter, because Mr. Galligan's summary judgment motion will be denied, the key issue with respect to the claim against the Town of South Windsor—whether Mr. Galligan violated Ms. Norton and Mr. William's Fourth Amendment rights—will still go forward to the jury.

### 1. The Common Factual Issues

The resolution of the claims against each party rests upon whether the warrantless search of the property at 460 Miller Road can be justified under the Fourth Amendment. In resolving this issue, the Court first must determine if several factual issues can be resolved at this stage or must await resolution by a jury: (1) if it can be fairly said that Ms. Norton and Mr. Williams used this property for commercial purposes; (2) if so, whether exigent circumstances existed to justify

the actions of the officials of the Town of South Windsor; and (3) if exigent circumstances did not exist, whether the community caretaking exception otherwise should apply and provide justification for the actions of the officials of the Town of South Windsor. As discussed below, these critical factual issues must be resolved by a jury.

Defendants argue that Plaintiffs' "property was not subjected to an unreasonable search and seizure under the Fourth Amendment." Defs.' Opp'n Mem. at 15. Although their property was zoned for residential use, "plaintiffs were using their residential property to carry out a scrap and junk business." *Id.* at 17. As a result, in Defendants' view, because "the plaintiffs were running an illegal scrap and junk business from their residential property, their expectation of privacy was greatly diminished[,]" as Fourth Amendment standards are different with respect to commercial properties. *Id.*

Plaintiffs claim they are unaware of Connecticut regulations regarding their junk and scrap acquisitions, as well as storage of hazardous waste and environmental contaminants. Defs.' Opp'n Mem. at 17. *Id.*

The Court agrees with Defendants, to some extent.

As the Supreme Court has long held, there is diminished Fourth Amendment protection where a "home [was] converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business," warranting a lesser protection of the Fourth Amendment. *Lewis*, 385 U.S. at 211. But given the hybrid use of 460 Miller Road as both a residence and a place of business, before determining what Fourth Amendment standard is relevant, this threshold issue must be decided. And the resolution of this issue, which requires credibility determinations, should be done by a jury, not this Court at the summary judgment stage. *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("[The court must *draw all reasonable*

*inferences in favor of the nonmoving party*, and *it may not make credibility determinations or weight the evidence*[.]" (emphasis in the original)); *see also Cicio v. Lamora*, No. 9:08-CV-432 (GLS/DEP), 2010 WL 1063875, at *8 (N.Y.N.Y. Feb. 24, 2010) ("the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact" (citation omitted)).

As a result, because this factual issue cannot be decided at this stage, summary judgment is denied to both Plaintiffs and Defendants.

Even if this were not the case, both the exigent circumstances and community caretaking exceptions require resolution of factual issues.

Here, Defendants argue that they "had specific information about the health, safety, and environmental emergencies that existed on the plaintiffs' property." Defs.' Opp'n Mem. at 14. More specifically, they had a "significant interest in regulating such potentially hazardous activity," especially considering the illegal business and storage of hazardous materials. *Id.* at 18. Defendants also claim that they acted because "the plaintiffs' property was a blighted junkyard that posed serious health and safety concerns to the community, including environmental hazards, breeding insects and rodents, creating an attractive nuisance, permitted continued blight, and driving down property values[.]" *Id.* at 21. Thus, in their view, their actions were reasonable as community caretakers. *Id.*

In response, Plaintiffs argue that no health and safety concerns were present when the allegedly illegal search was conducted. Pls.' Reply at 2. Plaintiffs rely on a Superior Court ruling from February 2019, holding that Ms. Norton "never received adequate notice of any violations under the existing or previous blight ordinances." *Id.* at 2-3 (citing *Town of South Windsor v.*

*Kristin Lanata (a.k.a. Kristin Norton)*, HHD-CV-17-6083374S, 2019 WL 1399954 (Super. Ct. Conn. Feb. 14, 2019)).

Summary judgment, however, should be denied when there are "genuine dispute[s] about whether an emergency existed[.]" *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009); *see also Terebesi v. Torreso*, 764 F.3d 217, 242 (2d Cir. 2014) ("We therefore agree with the district court that the issue of exigency is not appropriately decided on summary jdugment."); *Palmieri v. Kammerer*, 690 F. Supp. 2d 34, 45 (D. Conn. 2010) (denying summary judgment where "a reasonable jury could conclude that no exigent circumstances existed justifying a warrantless entry and warrantless search"). In other words, these issues should be resolved by a jury, not this Court at the summary judgment stage.

Accordingly, to the extent that any party seeks to resolve the viability of the Fourth Amendment claim, based on the application of any applicable standard or any exception, summary judgment will be denied.

### 1. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.* Fitzgerald, 457 U.S. 800, 818 (1982). However, "a defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006)).

"To overcome the defense of qualified immunity, a plaintiff must show both (1) the violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the alleged violation." *Huth v. Haslun*, 598 F.3d 70, 73 (2d Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Both Mr. Galligan and Mr. Yagaloff seek qualified immunity. Defendants argue that they are entitled to qualified immunity in their individual capacities because "plaintiffs have failed to demonstrate that the municipal defendants deprived them of any constitutional right." Defs.' Opp'n Mem. at 24. It is their view that, even if any of Plaintiffs' rights allegedly were violated, "it is beyond dispute that such rights were not clearly established." *Id.* at 26.

Plaintiffs argue that Defendants are not entitled to qualified immunity. In their view, the "right to be free from unlawful searches and seizures. . . .," Pls.' Reply at 5, is well-established and Defendants violated that clearly established constitutional right. *Id.*

The Court agrees that qualified immunity is not appropriate with respect to Mr. Galligan, at least not now and on this record. The Court disagrees with respect to Mr. Yagaloff and will dismiss the Fourth Amendment claim against him because of the qualified immunity doctrine.

For the same reasons discussed above that the Fourth Amendment claim cannot be resolved at the summary judgment stage, Mr. Galligan's qualified immunity defense cannot be resolved at this stage either. Because the jury must resolve whether the property was being used for commercial purposes, and whether the facts exist for the application of either the exigent circumstances exception or the community caretaking exception, this Court cannot decide whether qualified immunity should be applied to Mr. Galligan's actions until those factual issues are resolved. *See Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) ("[Q]uestions as to what situation confronted [the city's corporation counsel], what acts he performed, and his

motivation in performing those acts were questions of fact; they were to be – and were – answered by the factfinder.") (citations and internal quotation marks omitted)); *see also Outlaw v. City of Hartford*, 884 F.3d 351, 368 (2d Cir. 2018) ("The jury may be asked to make its findings by answering special interrogatories."); *cf. Hous. Works, Inc. v. Turner*, No. 00CIV.1122 (LAK) (JCF), 2004 L 2101900, at *26 (S.D.N.Y. Sept. 15, 2004) ("While the qualified immunity inquiry is generally an objective one, 'a defendant's subjective intent is indeed relevant . . . . Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail.'" (quoting *Johnson v. Ganim,* 342 F. 3d 105, 117 (2d Cir. 2003), *report and recommendation adopted as modified*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005)).

Indeed, there are factual circumstances where the qualified immunity defense would have to be rejected. It is well-settled that "searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City* , 547 U.S. at 403 (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)); s*ee also Michigan v. Tyler*, 436 U.S. 499, 506 (1978) (administrative searches fall within the Fourth Amendment and the "showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search, but the necessity for the warrant persists"); *Nino v. Doenges*, No. 14-CV-1130 (JCH), 2015 WL 12991308, at *5 (D. Conn. Oct. 5, 2015) ("[W]arrantless entries are presumptively unreasonable in the absence of a warrant or an exception to the warrant requirement.").

Once the jury determines these factual issues, this Court will determine the legal question of whether Mr. Galligan is entitled to qualified immunity. *See Lore*, 670 F.3d at 162 ("[A]lthough the district court properly put the fact questions to the jury, it erred in having the jury decide the ultimate legal question, in light of the facts established, of whether [the official]

in his personal capacity, was entitled to qualified immunity. That legal question should have been answered by the court.").

As a result, the Court will defer consideration of the defense of qualified immunity until after these issues are resolved.

Accordingly, the Court will not grant Mr. Galligan summary judgment on the Fourth Amendment claim against him because of qualified immunity, at least not at this stage of the case.

As to Mr. Yagaloff, "Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) (quoting 42 U.S.C. § 1983); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (explaining that "[t]he plain words of [Section 1983] impose liability whether in the form of payment of redressive damages or being placed under an injunction only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws'"). "The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979) (quoting § 1983). Second, the plaintiff must show that "[t]he conduct at issue '[was] committed by a person acting under color of state law.'" *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

In addition, Ms. Norton and Mr. Williams must show that Mr. Yagaloff, acting under color of state law, was personally involved in the alleged constitutional deprivation. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting

*McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1987 (1978)));

*Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order

to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must

show, *inter alia*, the defendant's personal involvement in the alleged constitutional

deprivation.").

This showing may be established if Mr. Yagaloff "(i) personally participated in the

alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who

committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff

by failing to act on information indicating that unconstitutional acts were occurring." *Provost v.

City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873

(2d Cir. 1995)). "Personal involvement includes direct participation, but only if the defendant

was aware of hard notice of the facts that rendered the action illegal." *Murvin v. Jennings*, 259 F.

Supp. 2d 180, 190 (D. Conn. 2003) (denying summary judgment where there was a factual issue

as to whether the defendant knew exonerating information about a suspect and still aided in his

arrest) (citing *City of Newburg*, 262 F.3d at 155).

While a question of fact may exist as to Mr. Yagaloff's level of participation in the

deprivation of Plaintiffs' constitutional rights, there is no record evidence that Mr. Yagaloff

removed any property of Ms. Norton and Mr. Williams himself. There also is no record evidence

that Mr. Yagaloff supervised any of the town employees actually removing property from 460

Miller Road. At best, his participation only involves his presence on site and his explanation of

the process to Ms. Norton and Mr. Williams.

But even if Mr. Yagaloff was present at and entered Ms. Norton and Mr. Williams'

property, they have not identified any clearly established Supreme Court or Second Circuit

precedent that, acting as a legal advisor to South Windsor, Mr. Yagaloff had a duty to intervene in the Town Manager's zoning enforcement proceedings. In the absence of clearly established law, Mr. Yagaloff is entitled to qualified immunity. *Ashcroff v. al-Kidd*, 563 U.S. 731, 735 (2011) (qualified immunity shields federal and state officials from monetary damages if "the right was [not] clearly established at the time of the alleged conduct" (citation omitted)).

Accordingly, summary judgment is granted as to the Fourth Amendment claim against Mr. Yagaloff.

### 2. *Monell* Claim

Municipalities, such as the Town of South Windsor, "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and citations omitted).

"[T]o prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). An official policy may be satisfied "where a plaintiff proves that

a 'municipal policy of some nature caused a constitutional tort.'" *Id.* (quoting *Monell*, 436 U.S. at 690-91).

"Courts have recognized four ways for plaintiffs to demonstrate a 'policy or custom': (1) 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' [ ]; (2) conduct ordered by a municipal official with policymaking authority [ ]; (3) actions taken 'pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels' [ ]; or (4) a 'failure to train' municipal employees that 'amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact[.]'" *Walker v. City of New York*, no. 12 CIV. 5902 PAC, 2014 WL 1259618, at *2 (S.D.N.Y. Mar. 18, 2014) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

The Town argues that Plaintiffs' *Monell* claim fails because "the municipal defendants did not deprive the plaintiffs of a constitutional or statutory right[.]" Defs.' Opp'n Mem. at 27. The Town also argues that Plaintiffs "have not alleged the existence of an unconstitutional policy or custom." *Id.* at 28. In their view, the enforcement action under the Anti-Blight Ordinance is insufficient as a single incident to prove an unconstitutional policy or custom, and to challenge the Anti-Blight Ordinance as applied, Plaintiffs would need to "demonstrate that the ordinance was unconstitutional on its face." *Id.* at 28 (emphasis omitted). As a result, they argue that because Plaintiffs have not alleged or argued the Anti-Blight Ordinance is facially unconstitutional, their *Monell* claim fails.

Finally, the Town of South Windsor argues that Plaintiffs' *Monell* claim should be considered abandoned because of the lack of response to its summary judgment motion.

The Court agrees.

In the Second Circuit, courts have properly deemed abandoned claims where parties failed to respond to the claim in response to a summary judgment motion. *See Storey v. Cello Holdings, LLC*, 347 F.3d 370, 380 n.6 (2d Cir. 2003) (claim deemed abandoned where party failed to raise it in its summary judgment briefing or its brief before the Second Circuit); *Packer v. SN Servicing Corp.*, 250 F.R.D. 108, 115 (D. Conn. 2008) (plaintiffs' failure to brief or argue claims in their summary judgment motion resulted in abandonment of those claims). The application of this principle here is warranted.

The resolution of the issue of the Town of South Windsor's liability issue depends on the level of authority vested in Mr. Galligan, South Windsor's Town Manager, who indisputably was on site and directed the activities underlying this lawsuit, and whether that authority was sufficient to bind the Town.[6] But the ultimate issue is whether Mr. Galligan violated Ms. Norton

---

[6] "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law[.]" *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.*

For municipal liability to attach in this context, however, "the decisionmaker [must] possess[ ] final authority to establish municipal policy with respect to the action ordered." *Id.* There must be "a deliberate choice to follow a course of action [ ] made from among various alternatives by the official or officials for establishing final policy with respect to the subject matter in question." *Id.* at 483. State law determines whether an individual is a policymaking official. *See Praprotnik*, 485 U.S. at 123.

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker." *City of Okla. v. Tuttle*, 471 U.S. 808, 823-824 (1985). "Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Where the constitutional deprivations resulted from "the unconstitutional application of a valid policy, or by a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Id.* at 126. These types of actions or conduct provide "a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Id.*

and Mr. Williams's Fourth Amendment rights, an issue that must be addressed at trial in any event.

As a result, in this particular case, the claim against the Town of South Windsor is largely duplicative of the claims against Mr. Galligan, although the claim against Mr. Galligan in his individual capacity actually is broader, given the possibility of punitive damages, not available against the Town of South Windsor. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)("[W]e find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials' under 42 U.S.C. § 1983").

Accordingly, in the absence of a response by Ms. Norton and Mr. Williams to the Town of South Windsor's motion for summary judgment, the Court will consider this claim to be abandoned and will grant summary judgment for the Town of South Windsor.

## B. Art. I, Sec. 7 of the Connecticut Constitution[7]

Art. I, Sec. 7 of the Connecticut Constitution provides, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause . . . ." C.G.S.A. Const. Art. I, § 7. The Supreme Court provides persuasive authority for Connecticut law, but will be followed "'only when they provide no less individual protection than is guaranteed by Connecticut law.'" *State v. DeFusco*, 224 Conn. 627, 632 (1993) (quoting *State v. Marsala*, 216 Conn. 150, 160 (1990)).

---

[7] Plaintiffs object to Defendants' cross motion for summary judgment. Pls.' Reply at 1. Defendants believe that their Rule 56(a)1 Statement of Material Facts should be deemed admitted as a matter of law because Plaintiffs' reply brief did "not include a Rule 56(a)2 statement admitting or denying any of the facts set forth in the defendants' Rule 56(a)1 statement." Defs.' Response at 1.

Defendants argue Plaintiffs' claim under Art. I, Sec. 7 of the Connecticut Constitution fails because they have not stated a viable cause of action as the Connecticut Supreme Court "has been extremely reluctant to create private causes of action for money damages. . . ." and money damages are permitted under the Connecticut Constitution in a limited set of circumstances. Defs.' Supp. Mem. at 3. In the Defendants' view, the "instant matter does not include such misconduct" sufficient to state a private cause of action under Connecticut constitutional law. *Id.* at 4. Furthermore, Defendants argue that, should this Court recognize a cause of action, "it would lead to the state and federal judiciary being able to second-guess the executive actions of local governments, which is contrary to the law and the principle of separation of powers." *Id.* at 5. As Plaintiffs can pursue a remedy under § 1983, "there is no basis for creating a cause of action under the Connecticut Constitution." *Id.*

Defendants further argue that Plaintiffs have abandoned their claim under Art. I, Sec. 7 of the Connecticut Constitution because Plaintiffs "make no attempt to address this argument in their reply brief." Defs.' Response at 3. Their failure to do so indicates an abandonment of this claim. *Id.*

The Court disagrees with the first argument, but will dismiss the claim based on the second.

Monetary damages are available for violations of Art. I, Sec. 7 of the Connecticut Constitution. *See Binette v. Sabo*, 244 Conn. 23, 25-26 (1998) (In certifying a question from the Federal District of Connecticut, the Supreme Court found that the "Connecticut constitution gives rise to a private cause of action for money damages stemming from alleged violations of article first, §§ 7 and 9, of [the] state constitution."). Because the Connecticut Supreme Court has already created a cause of action, this argument fails.

But while this claim under the Connecticut Constitution may exist, Ms. Norton and Mr. Williams's failure to articulate the contours of this claim warrants its dismissal now. *See Storey, LLC*, 347 F.3d at 380 n.6 (claim deemed abandoned where party failed to raise it in its summary judgment briefing or its brief before the Second Circuit); *Kaminsky v. Mattson*, 200 F. Supp. 3d 397, 400 (D. Conn. 2018), *aff'd sub nom. Kaminsky v. Schriro*, 760 F. App'x 69 (2d Cir. 2019) (finding plaintiff's Connecticut constitutional claim abandoned where plaintiff did not respond to defendants' opposition brief); *Packer*, 250 F.R.D. at 115  (plaintiffs' failure to brief or argue claims in their summary judgment motion resulted in abandonment of those claims).

Ms. Norton and Mr. Williams have not provided the Court with an analysis of their separate state constitutional claim. The relatively novel and undefined nature of this claim further supports dismissal. *Cf. Traylor v. Hammond*, 94 F. Supp. 3d 203, 222 (D. Conn. 2015) (declining to exercise supplemental jurisdiction as "'novel and undeveloped issues of state law'" were raised as "'the State [is] the final arbiter of its own Constitution'" (quoting *Silvera v. Conn. Dep't of Corr.*, 726 F. Supp. 2d 183, 200 (D. Conn. 2010)); *see also Young v. New York City Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) (as a matter of comity and justice between parties, a federal court "ought not 'reach out for . . . issues, thereby depriving state courts of opportunities to develop and apply state law'" (*Mayer v. Oil Field Systems Corp.*, 803 F.2d 749, 757 (2d Cir. 1986)).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED**; Defendants' motion for summary judgment is **GRANTED** in part, as it relates to Mr. Yagaloff

and the Town of South Windsor, but otherwise is **DENIED**. Defendants' motion for summary judgment as to the slander claims against Mr. Yagaloff is **MOOT**.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of March, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE